S96G0514. MONROE et al. v. SAVANNAH ELECTRIC & POWER
COMPANY.
(471 SE2d 854)

HUNSTEIN, Justice.

Monroe's decedent Scott Ussery was towing a shrimp boat to Walsh's Dock on Tybee Island when a metal stanchion on the boat came into contact with an overhead power line that supplied the dock with electricity provided by Savannah Electric & Power Company. When Ussery stepped out of his vehicle, the electricity grounded through his body, the fuses installed by Savannah Electric did not blow, and Ussery was killed. It is undisputed that the electricity had not yet passed through the electric power meter at Walsh's Dock. Monroe filed suit against Savannah Electric alleging strict liability in tort, negligent design, negligent inspection/repair, and failure to warn. The trial court granted Savannah Electric's motion for partial summary judgment on the strict liability claim and the Court of Appeals affirmed, finding that electricity can be considered "property" within the meaning of Georgia's strict liability statute, OCGA § 51-1-11 (b) (1), but because the electricity had not passed through the electric power meter, there had been no sale, as required by the statute. *Monroe v. Savannah Electric &c. Co.,* 219 Ga. App. 460 (465 SE2d 508) (1995) (physical precedent). We granted certiorari to consider the first impression questions (1) whether under OCGA § 51-1-11 (b) (1) electricity is a "product" and (2) if so, when it is "sold."[1]

OCGA § 51-1-11 (b) (1) provides that

[t]he manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort . . . to any natural person who may

---

[1] We did not grant certiorari on and, under the facts in this case it is not necessary here to address, the third of the three "dispositive legal questions" in applying product liability to distributors of electricity, see *Bryant v. Tri-County EMC,* 844 FSupp. 347, 349 (A) (W.D.Ky. 1994), namely, when does electricity contain a defect.

use, consume, or reasonably be affected by the property and who suffers injury . . . because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

1. As to the first question for which certiorari was granted, our review of the law supports the conclusion reached in *Bryant v. Tri-County EMC*, 844 FSupp. 347 (W.D.Ky. 1994), that "[t]he majority of the state courts considering this issue have encountered little difficulty deciding that electricity is a product." (Footnote omitted.) Id. at 349 (A). Electricity has been deemed a product for strict liability purposes not merely because it can be produced, confined, controlled, transmitted, and distributed in the stream of commerce, *Ransome v. Wisconsin Elec. Power Co.*, 275 NW2d 641, 643 (Wis. 1979), but also because it "is artificially manufactured, can be measured, bought and sold, changed in quantity or quality, delivered wherever desired and [is subject to] larceny." *Elgin Airport Inn v. Commonwealth Edison Co.*, 410 NE2d 620, 624 (Ill. App. 1980). See *Bryant*, supra, 844 FSupp. at 352 (C) (general view holding electricity to be a product "sensibly accounts for the fact that electricity is created, harnessed, measured, transported, bought and sold, like products generally"). See also 60 ALR4th 732, § 3, Products Liability: Electricity; Am. Law of Products Liability 3d, §§ 37:13 and 117:1 et seq. Our review of the rationale set forth in *Otte v. Dayton Power &c. Co.*, 523 NE2d 835 (Ohio 1988)[2] fails to persuade us to adopt the minority position presented therein. Instead, we concur with the rationale presented in the majority view and accordingly hold that electricity is a product within the meaning of OCGA § 51-1-11 (b) (1).

2. As to the second question regarding when electricity is sold for purposes of OCGA § 51-1-11 (b) (1), it is well-established that it is not essential for a product's title to have passed and the purchase price to have been paid in order for the product to qualify as "sold" under the statute. *Robert F. Bullock, Inc. v. Thorpe*, 256 Ga. 744, 745 (353 SE2d 340) (1987). In *Thorpe*, this Court affirmed the Court of Appeals' holding that "in order to effectuate the purpose of [OCGA § 51-1-11], 'sold' would be construed to mean 'placed in the stream of commerce.' [Cit.]" Id.

Savannah Electric urges this Court to follow the direction taken

---

[2] *Otte* holds that electricity falls outside the definition of "product" as "anything made by human industry or art" given that "electricity is the flow of electrically charged particles along a conductor" and the utility company "does not manufacture electrically charged particles, but rather, sets in motion the necessary elements that allow the flow of electricity." Id., 523 NE2d at 838. See also *Wyrulec Co. v. Schutt*, 866 P2d 756 (Wyo. 1993); *Bowen v. Niagara Mohawk Power Corp.*, 590 NYS2d 628 (A.D. 4 Dept. 1992).

by the many foreign courts that have adopted the bright line rule that electricity is "sold" when it has passed through the electric meter for purposes of determining the amount of electricity sold to the consumer. See, e.g., *Bryant*, supra, 844 FSupp. at 352 (C); *Ransome*, supra, 275 NW2d at 649; *Schriner v. Penn. Power &c. Co.*, 501 A2d 1128, 1133 (Pa. Super. 1985). Clearly, a determination whether or not electricity had passed through a meter will control the "sale" issue in the vast majority of cases. However, our review of cases from other jurisdictions has revealed cases addressing unusual factual scenarios in which the foreign court reached the conclusion (in which we agree) that although the electricity had not come through the meter at the time the injury to the consumer occurred, there were facts from which a factfinder could hold the manufacturer strictly liable. See, e.g., *Stein v. Southern Cal. Edison Co.*, 7 Cal. App. 4th 565 (8 Cal. Rptr. 2d 907) (1992) (high voltage entered meter causing it to explode but never passed through meter);[3] *Aversa v. Public Svc. Electric &c. Co.*, 451 A2d 976, 980 (N.J. Super. 1982) (employee injured by current conveyed inside company "switchhouse" prior to passing through meter). In *Stein*, supra, the California court

> decline[d] to delineate the particular point at which it can be said that electricity enters the stream of commerce for all purposes. "[T]he many variations in electrical systems prevent our drawing a 'bright line' at a particular point." [Cit.]

Id., 7 Cal. App. 4th at 571 (1).

Given that this Court rejected a rigid definition of when a product is "sold" under OCGA § 51-1-11 (b) (1) in *Thorpe*, supra, and instead recognized the need for a more flexible, case-by-case factual analysis for the determination of this issue, we conclude that it would be inconsistent with Georgia law to adopt a rigid bright line rule exclusively in regard to the sale of electrical current. Thus, we agree with the New Jersey court in *Aversa*, supra, 451 A2d at 980, that "a sale is not an absolute prerequisite to a finding that a product has been placed in the stream of commerce." Id.

In *Thorpe*, supra, this Court stressed the fact that the manufacturer had "put the product in the hands of and under the control of a consumer." Id. at 745. These facts are important because they constitute this Court's recognition that the manufacturer had relinquished exclusive control over the product and that the product was in a usable or marketable condition. We conclude that these factors are

---

[3] We note that in California, a sale of the product is not necessary for imposition of product liability; rather, "the object must be 'place(d) on the market, knowing that it is to be used without inspection for defects, . . .' [Cit.]" *Stein*, supra, 7 Cal. App. 4th at 571.

equally applicable to the issue of when electricity is "sold" under OCGA § 51-1-11. Our conclusion is consistent with that of other states which, in addressing this issue, have recognized that the relinquishment of control over electricity and/or the marketable condition of that electricity are essential factors in determining whether the electricity had been placed in the stream of commerce by the manufacturer for purposes of strict liability. See, e.g., *Priest v. Brown*, 396 SE2d 638, 641 (S.C. App. 1990) (sale need not occur in literal sense for strict liability to apply as long as product is injected into the stream of commerce by other means; facts in case showed the electricity was not in a form immediately usable by a consumer); *Smith v. Home Light &c. Co.*, 734 P2d 1051, 1055 (Colo. 1987) (at least until electricity reaches point where it is made available for consumer use, it is not a "product" that has been "sold" or otherwise "placed in the stream of commerce" for the purpose of strict product liability; only at that point has utility company released control over electricity that is expected to have been reduced to marketable voltage); *Public Svc. Indiana v. Nichols*, 494 NE2d 349, 355 (Ind. App. 1986) (electricity must be in a marketable and marketed state at time it causes injury, meaning it has been reduced from a transmission voltage to a consumption voltage); *Aversa,* supra, 451 A2d at 980 (evidence that electric company relinquished exclusive control over its product may establish strict liability at point prior to its running through meter).

3. The evidence in this case establishes uncontrovertedly that Monroe's decedent was killed as a result of contact with a high-voltage overhead power line. The power line served only Walsh's Dock and the electricity carried by the line was dedicated to this one consumer. At the point where Monroe's decedent came into contact with the electricity, it had already gone through one transformer at the edge of the property. However, the evidence established that despite this initial step-down, the electricity Monroe's decedent encountered was electrical energy in an unmarketable and unmarketed state. The evidence further established that the electricity encountered by Monroe's decedent was not under the control of any consumer at Walsh's Dock or anyone who might reasonably and foreseeably be expected to encounter it and that Savannah Electric had not relinquished its exclusive control over the electricity.

Based on this analysis of the facts in this case, we conclude that the electricity that caused the death of Monroe's decedent had not been sold for purposes of holding Savannah Electric strictly liable under OCGA § 51-1-11 (b) (1). Therefore, the trial court correctly granted Savannah Electric's motion for partial summary judgment and the Court of Appeals did not err by affirming the trial court's ruling.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 24, 1996 —
RECONSIDERATION DENIED JULY 12, 1996.

*Bergen & Bergen, Joseph B. Bergen, Frederick S. Bergen,* for appellants.

*Bouhan, Williams & Levy, Walter C. Hartridge, Carlton E. Joyce,* for appellee.

*Troutman Sanders, Robert L. Pennington, McNatt, Greene & Thompson, Hugh B. McNatt,* amici curiae.